UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------X
CHRISTOPHER CAPELA, individually and on
behalf of all others similarly situated,

       Plaintiff(s),      **REPORT AND**
                 **RECOMMENDATION**
    -against-        CV09-882 (SJF) (WDW)

J.G. WENTWORTH, LLC, J.G. WENTWORTH
MANAGEMENT COMPANY, LLC,
J.G. WENTWORTH S.S.C. LIMITED PARTNERSHIP,
and 321 HENDERSON RECEIVABLES ORIGINATION, LLC,

       Defendant(s).
--------------------------------------------------------X

**WILLIAM D. WALL, United States Magistrate Judge:**

   Before the court on referral from District Judge Feuerstein is a motion to dismiss by

defendants J.G. Wentworth, LLC, J.G. Wentworth Management Company, LLC, J.G. Wentworth

S.S.C. Limited Partnership, and 321 Henderson Receivables Origination, LLC (collectively, "the

defendants").  DE[18, 20 & 23[1]].  The motion is opposed by the plaintiff, Christopher Capela.

DE[19].  For the reasons set forth herein, I recommend that the motion be granted and the

complaint dismissed on the following grounds: (1) the Truth in Lending Act and New York

General Business Law claims, seeking damages and injunctive relief, are barred both by claim

preclusion and failure to state a claim; (2) the unjust enrichment claim has been withdrawn by the

plaintiff.

---

   [1][DE] 23 is a revised version of DE[18] that replaced a page missing from Exhibit B, a
copy of the Purchase Agreement between the plaintiff and defendant 321 Henderson Receivables
Origination, LLC.  Thus, citations to Ex. B are to DE[23], not DE[18].

**BACKGROUND**

This action was commenced on 3/3/09 with the filing of the summons and complaint, which is set forth as a potential class action, the plaintiff appearing "individually and on behalf of all others similarly situated." DE[1].  The Complaint asserts claims pursuant to the Truth in Lending Act ("TILA"), 15 U.S.C. §1601,  New York General Business Law §349 and common law unjust enrichment.  The motion to dismiss was fully briefed on 7/06/09 and referred to me on 8/31/09.

According to the defendants, they purchase the rights to structured settlement payments, giving parties who are the beneficiaries to settlement agreements a smaller sum of money than the overall amount to which they are entitled, in exchange for the right to collect the larger sum over time.  The benefit to the beneficiaries of the settlement is the receipt of a lump sum of money now, rather than receiving payments over time.  The defendants report that the named plaintiff, Christopher Capela, and defendant 321 Henderson Receivables Origination, LLC ("Henderson") engaged in such a transaction.  The Complaint alleges only that Capela and the proposed class members each engaged in such a transaction, but does not provide further details. The defendants characterize the transaction between Capela and Henderson  as a sale, referencing, *inter alia,* the Purchase Agreement signed by Capela.  *See* DE[23], Ex. B.[2]  The

---

[2]In their Memorandum of Law in Support of the Motion to Dismiss, the defendants note that the Purchase Agreement (DE[23], Ex. B], while not attached to the Complaint, is incorporated by reference to it in the Complaint and thus can be considered in the determination of this motion.  *See* DE[18-1] at 5, n.7 (citing *Meselsohn v. Lerman,* 485 F. Supp. 2d 215, 216 (E.D.N.Y. 2007)).  I agree that the court can consider the Agreement, although it is not overtly referred to in the Complaint.  In deciding a Rule 12 motion, the court may consider documents upon which the plaintiff relied when drafting the complaint, including documents "incorporated in it by reference, . . . matters of which judicial notice may be taken, or . . . documents either in plaintiff['s] possession or of which plaintiff[] had knowledge and relied on in bringing suit."

plaintiff characterizes the transaction as a loan, subject to the requirements of TILA, describing the defendants as "factoring companies . . . [that] target consumers who are scheduled to receive structured settlement payments in the future but would rather forego those future payments in exchange for a smaller cash payment, paid up front." Complaint, DE[1], ¶10. The nature of the underlying transaction - referred to as a loan by the plaintiff, a sale by the defendants, and a transfer by the state court - is critical to this motion.

The Purchase Agreement between Capela and Henderson was signed on July 13, 2007. Henderson then filed a petition in Supreme Court, Suffolk County, pursuant to New York's Structured Settlement Protection Act ("SSPA"), GOL §5-1701, *et seq.*, naming Henderson as Petitioner, and Capela, Allstate Life Insurance Company of New York and Allstate Settlement Corporation as "Interested Parties pursuant to GOL Section 5-1701(f)." Messite Aff., DE[18], ¶¶4, 11. The Petition sought approval of the structured settlement payment transfer. In that action, the parties filed a Stipulation stating that Capela had entered into a Settlement Agreement on January 11, 2000 in connection with a personal injury claim, and that the settlement agreement provided for disbursal of periodic payments to Capela by Allstate Settlement Corporation. Allstate Settlement had purchased an annuity contract from Allstate Insurance

---

*Green v. The City of New York,* 438 F. Supp. 2d 111, 119 (E.D.N.Y. 2006)(quoting *Chambers v. Time Warner, Inc.,* 282 F.3d 147, 153 (2d Cir. 2002)(additional internal citations omitted). And, "where a document is not incorporated by reference, the court may nevertheless consider it where the complaint relies heavily, albeit implicitly, upon its terms and effect, which renders the document integral to the complaint." *Chambers,* 282 F.3d at 152-53 (internal quotation marks omitted). Here, the complaint does rely heavily on the terms and effect of the Purchase Agreement, and the plaintiff was in possession of it and necessarily relied on it to make his allegations of non-disclosure. Further, this court can take judicial notice of the Order of the Suffolk County Supreme Court. *See* DE[18], Ex. E, and the other documents filed in connection with that action.

Company of New York to fund the periodic payments. *Id.*, ¶12, Ex. D.  The parties further stipulated that they had entered into the Purchase Agreement by which Capela was to receive funds from Henderson in exchange for Capela's rights to two future payments from Allstate Settlement.  The Allstate entities did not object to the transaction between Capela and Henderson.  Capela also filed an Admission of Service of the papers in the action, which stated, *inter alia:* "I fully support the request for the transfer sought therein and I do not oppose the application nor do I intend to oppose same in Court on the return date of September 28, 2007 or on any adjourn [sic] date."  Bigelow Aff., DE[19], Ex. A.  Capela was represented by counsel in the action.  *See* Messite Aff., DE[18], ¶10, Ex. C.

On March 7, 2008, Suffolk County Supreme Court granted Henderson's Petition and approved the transaction.  *See* DE[18], Ex. E.  The Supreme Court Order provided, *inter alia,* that the transaction complied with all requirements of the SSPA, that it was in Capela's best interest, that it did not contravene any applicable federal or state statute, and that Capela had been provided with disclosures "meeting the requirements of GOL §5-1703" in a timely fashion.  *Id.* Despite those rulings, Capela now claims that the transactions engaged in by the defendants with structured settlement beneficiaries violate both the Truth in Lending Act ("TILA"), 15 U.S.C. §1601 *et seq.*, Regulation Z, 12 C.F.R. §226, and New York's General Business Law, §349.  *See* Complaint, DE[1].  The alleged violations involve failures to disclose and are predicated on the plaintiff's characterization of the transaction as a loan, not a sale.

The Complaint, the court notes, gives no detail at all about the specific transaction between Capela and Henderson, other than to allege that "Defendants entered into loan agreements with Plaintiff and other consumers" and that "Plaintiff and each Class member

4

entered into a consumer credit transaction with one of the Defendants that was memorialized in an agreement governed by [TILA], a finance contract." Compl., DE[1], ¶¶6 & 46. Nor does the Complaint mention the state court's approval of the transaction between Capela and Henderson.

The defendants move pursuant to Rules 12(b)(1) & (6), arguing that the Complaint must be dismissed because (1) the court lacks subject matter jurisdiction pursuant to the Rooker-Feldman doctrine; (2) the plaintiff's claims are barred by issue and claim preclusion; (3) the claims fail to state a cause of action, and (4) the court should abstain from considering the claims. I now turn to those arguments, each of which is opposed by the plaintiff.

## DISCUSSION

**Standard For Motion To Dismiss**:

In determining a motion pursuant to Federal Rule 12(b)(1), the court accepts as true all factual allegations in the plaintiff's complaint. *See Green v. The City of New York,* 438 F. Supp. 2d 111, 118 (E.D.N.Y. 2006)(citing *Atlantic Mut. Ins. Co. v. Balfour Maclaine Intern. Ltd,* 968 F.2d 196, 198 (2d Cir. 1992)). However, inferences favorable to the party asserting jurisdiction should not be drawn. *Id.* (quotation marks omitted). "A case is properly dismissed under 12(b)(1) when 'the district court lacks statutory or constitutional power to adjudicate it.'" *Id.* (quoting *Makarova v. U.S.,* 201 F.3d 110, 113 (2d Cir. 2000)). It is the plaintiff's burden to prove subject matter jurisdiction by a preponderance of the evidence. *Id.* (citing *Aurecchione v. Schoolman Transp. Sys., Inc.,* 426 F.3d 635, 638 (2d Cir. 2005)).

Standards applicable to 12(b)(6) motions have recently changed. In *Bell Atlantic Corp. v. Twombly*, 127 S. Ct. 1955 (2007), the Supreme Court rejected the "oft-quoted" standard set forth in *Conley v. Gibson*, 355 U.S. 41, 78 (1957), that a complaint should not be dismissed, "unless it

5

appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." Id. at 45-46. *Twombly* discarded the "no set of facts" language in favor of the requirement that the plaintiff must plead enough facts "to state a claim for relief that is plausible on its face." 127 S. Ct. at 1974. The "plausibility" language used by the Supreme Court in *Twombly* has not been interpreted by the Second Circuit to require a "universal standard of heightened fact pleading," but to require a complaint to "amplify a claim with some factual allegations in those contexts where such amplification is needed to render the claim *plausible."* *Iqbal v. Hasty*, 490 F.3d 143,158 (2d Cir. 2007) (emphasis in original). Post-*Twombly,* the court must still assume that well-pleaded factual allegations set forth in a complaint are true and draw all inferences in favor of the non-moving party (s*ee, e.g., Holmes v. Poskaner,* 2009 WL 2171326 (2d Cir. Jul. 21, 2009)), but those factual allegations must be enough to "raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact).*'" Williams v. Berkshire Fin. Grp. Inc.*, 491 F. Supp. 2d 320, 324 (E.D.N.Y. 2007)(quoting *Twombly*, 127 S. Ct. at 1959); *see also ATSI Communications, Inc. v. Shaar Fund, Ltd.,* 493 F.3d 87, 98 (2d Cir. 2007).

And there remains a significant difference between factual allegations and legal conclusions. In *Ashcroft v. Iqbal,* 129 S. Ct. 1937 (2009), the Supreme Court explained that "[t]wo working principles underlie [the] decision in *Twombly*. First, the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." 129 S. Ct. at 1949. Although for the purposes of a motion to dismiss the court must accept as true the factual allegations in the complaint, it is not "bound to accept as

true a legal conclusion couched as a factual allegation." *Id.* at 1949-50. As the *Ashcroft* court noted, Federal Rule 8 may be a generous departure from stricter pleading rules of the past, but "it does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions." *Id.* at 1950. The second principle underlying *Twombly*, *Ashcroft* explains, is that only a complaint that states a plausible claim for relief will survive a motion to dismiss. *Id.* at 1950. "The plausibility standard is not akin to a probability requirement, but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* at 1949 (internal quotation marks and citations omitted). Where "the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged – but it has not shown – that the pleader is entitled to relief." *Id.* at 1950 (internal quotation and punctuation marks omitted). Determining whether a complaint states a plausible claim for relief is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* Where the well-pleaded facts do not permit the court to infer "more than the mere possibility of misconduct, the complaint has alleged - but it has not shown - that the pleader is entitled to relief." *Id.* (internal citations and punctuation omitted).

With these standards in mind, I turn to the issues raised in the motion.

**Application of Rooker-Feldman:**

"When a federal suit follows a state suit, the former may be prohibited by the so-called *Rooker-Feldman* doctrine," and the defendants' threshold argument is that the state court's approval of the transaction in the state court proceeding requires the application of Rooker-Feldman here. *Hoblock v. The Albany County Bd. of Elections,* 422 F.3d 77, 83 (2d Cir. 2005). In *Hoblock,* the Second Circuit examined the Supreme Court's then-recent consideration of the

Rooker-Feldman doctrine in *Exxon Mobil Corp. v. Saudi Basic Indus. Corp.,* 544 U.S. 280, 125 S. Ct. 1517 (2005), noting that the two cases from which the doctrine derived "established the clear principle that federal district courts lack jurisdiction over suits that are, in substance, appeals from state-court judgments, but . . . provided little guidance on how to apply that principle." *Hoblock,* 422 F.3d at 84. Before *Exxon Mobil*, the Second Circuit applied Rooker-Feldman expansively, but in *Exxon Mobil,* "the Supreme Court pared back the *Rooker-Feldman* doctrine to its core, holding that it 'is confined to cases of the kind from which the doctrine acquired its name: cases brought by state-court losers complaining of injuries caused by state-court judgments rendered before the district court proceedings commenced and inviting district court review and rejection of those judgments.'" *Id.* at 85 (citing *Exxon Mobil*, 125 S. Ct. at 1521-22). From that holding, the Second Circuit extrapolated four requirements for the application of Rooker-Feldman: (1) the federal court plaintiff must have lost in state court; (2) the plaintiff must complain of injuries caused by a state court judgment; (3) the plaintiff must invite district court review and rejection of the state court judgment; and (4) the state court judgment must have been rendered before the federal court proceedings. *Id.* The first and fourth requirements, *Hoblock* notes, can be loosely termed procedural and the second and third termed substantive. *Id.*

Here, the first and fourth procedural requirements are met. On a superficial level Capela cannot be said to have "lost in state court" because he wanted approval of the Purchase Agreement as much as Henderson did, but the defendants argue that the "loser" requirement is met where an agreed-upon resolution in the state court is subsequently challenged in a federal action. *See* DE[18-1] at 12 (citing *Green,* 438 F. Supp. 2d at 119 (citing *Allianz Ins. Co. v.*

8

*Cavagnuolo,* 2004 WL 1048243 (S.D.N.Y. May 7, 2004)).  Capela argues that the plaintiffs in *Green* and *Allianz* were challenging settlements reached in adversary proceedings, and that the Suffolk Supreme Court proceeding was neither adversarial nor settled.  DE[19] at 13-14.  I find the plaintiff's argument unconvincing.  As the court in *Green* noted, "rather than putting the court in the position of evaluating subjectively whether a [court approved agreement] should be considered a loss, it seems sufficient for plaintiff[] to allege that the court-approved [agreement] violated their rights.  438 F. Supp. 2d at 119.  In *Green* and in *Allianz* the parties reached agreements after lawsuits were started and the courts approved them.  Here, the parties reached an agreement before the lawsuit was started and the court approved it.  That the agreements in *Green* and *Allianz* were settlements is a difference that is not significant to the Rooker-Feldman analysis.  Thus, the first requirement is met.  The timing requirement is also met.  The state court order was issued on March 7, 2008 and this lawsuit was initiated on March 3, 2009.

The applicability of the other two factors is not so clear cut.  The third factor requires that the federal lawsuit must invite review and rejection of the state court judgment.  The defendants argue that the state court order "allowed and approved the transaction between the parties, determining that the transaction was in Capela's best interests and did not violate any state or federal law, . . . [and] Capela now seeks to have this Court reverse that determination and find that the transaction in question, only made possible by the state court's ruling, violated both state and federal law and unjustly enriched defendants."  DE[18-1] at 11.  The plaintiff disagrees, arguing that if he prevails in this lawsuit, the state court's order would be left intact, since TILA[3]

---

[3]In his arguments against the application of the Rooker-Feldman doctrine, as well as those in opposition to the application of issue and claim preclusion, the plaintiff refers only to his TILA claims and nowhere mentions his claims pursuant to GBL §349.  Although this lapse could be

would require a damages award, not rescission of the agreement or vacatur of the state-court order. DE[19] at 10. In the Complaint, Capela seeks statutory damages under TILA and actual damages under NY GBL §349. Compl., DE[1], WHEREFORE Clause, §§(b) & (c). He also sought an order that the defendants be required "to pay restitution and to disgorge into a common fund or constructive trust all monies paid by Plaintiff and the Class to the full extent to which Defendants were unjustly enriched by their unlawful and inequitable conduct" (*id.*, §(f)), but he has withdrawn the unjust enrichment claim. *See* DE[19] §C. Thus, he argues, to the extent that the state court order approved the Purchase Agreement, he does not ask for review or reversal of that order.

That view, however, ignores other aspects of the state court order, notably, its finding that the Agreement did not violate federal or state statutes and the fact that the complaint herein expressly asserts violations of both state and federal law. The state court order specifically found that the transfer of Capela's rights under the structured settlement complied with all requirements of New York's "Structured Settlement Protection Act, GOL §5-1701 *et seq.* and 26 U.S.C. §5891, Pub.L.107-134, Title 1, §115" and that the "Proposed Transfer does not contravene any applicable federal or state statute or the order of any court or responsible governmental or administrative authority." DE[18], Ex. E, p. 2 ¶¶(a) & (d). Thus, the defendants argue, a finding in this lawsuit that the transfer did, in fact, violate TILA and/or NY GBL §349 would contradict the latter finding. The plaintiff, on the other hand, argues that the state court never considered TILA (or, by implication, NY GBL §349) and that his claims based on those statutes are

_____

considered a waiver, I will consider the TILA arguments as directed to both sets of claims for purposes of this motion.

"independent claims" such as those recognized in *Exxon Mobil* and in *McKithen v. Brown*, 481 F.3d 89 (2d Cir. 2007). *See* DE[19] at 11. The defendants suggest that the new claims are not independent but are "inextricably intertwined." DE[18-1] at 10.

The Second Circuit has considered how a court should determine whether a federal suit raises an independent, non-barred claim. *See Hoblock,* 422 F.3d at 86-87. "At first glance, one might think that a federal claim is independent of claims raised in state court if the federal claim is premised on a theory not passed upon by the state court. . . . Just presenting in federal court a legal theory not raised in state court, however, cannot insulate a federal plaintiff's suit from *Rooker-Feldman* if the federal suit nonetheless complains of injury from a state-court judgment and seeks to have that state-court judgment reversed." *Id.* at 86. In this regard, courts have held that some claims not raised in state court are so "inextricably intertwined" with the claims that were raised in state court that Rooker-Feldman would apply. *Id.* (citing *District of Columbia Court of Appeals v. Feldman,* 460 U.S. 462 (1983) & *Moccio v. New York State Office of Court Administration,* 95 F.3d 195 (2d Cir. 1996)). "In light of *Exxon-Mobil* . . . [however], it appears that describing a federal claim as 'inextricably intertwined' with a state-court judgment only states a conclusion." That is, the phrase "inextricably intertwined" lacks independent content, but is "simply a descriptive label attached to claims that meet the requirements outlined in *Exxon-Mobil." Hoblock,* 422 F.3d at 86-87. This brings us back, then, to the question of whether, inasmuch as the plaintiff has stated he does not seek to rescind the transfer of rights to the structured settlement payments, he is seeking to "review and reverse the state court judgment." Answering that question leads to the last Rooker-Feldman issue - whether the plaintiff complains of an injury caused by the state court judgment. Indeed, "this is the core

requirement from which the others derive; focusing on it helps clarify when the doctrine applies." *Id*. at 87.

The plaintiff claims that the only injuries he complains of are failures to disclose and a delay in payment beyond the suggested time frame. The alleged TILA injuries, he argues, preceded the initiation of the state court action and would have occurred whether or not the state court had ever entered its judgment. DE[19] at 12. TILA disclosures, the plaintiff argues, must be made "before consummation of the transaction," and "consummation" is defined by TILA as "the time that a consumer becomes contractually obligated on a credit transaction." *Id.* Courts have interpreted "consummation" as "the time when a borrower signs the loan documents and becomes obligated to pay, even if the loan is contingent on some subsequent occurrence." *Id.*(citing *United States v. Petroff-Kline,* 557 F.3d 285, 296 (6th Cir. 2009); *Bragg v. Bill Heard Chevrolet, Inc.,* 374 F.3d 1060, 1066 (11th Cir. 2004)).[4] Based on this reasoning, he asserts both that the TILA violations occurred and the transaction was consummated on July 13, 2007, when he signed the Purchase Agreement. Thus, he argues, the state court judgment, which issued on March 7, 2008, could not have caused his prior-existing injuries, even though it approved the transfer of structured settlement rights.

---

[4]In the event that District Judge Feuerstein does not accept my conclusion *infra* that TILA does not apply to the transaction between the parties, the plaintiff's argument raises questions about the statute of limitations for the TILA claims. TILA has a one year statute of limitations, deemed by some courts as commencing on the date of the alleged violation. *See* 15 U.S.C. §1640(e); *see also Lewis v. Nissan North America, Inc.*, 2004 WL 2093467, *3 (S.D.N.Y. Sept. 17, 2004). Other courts deem the commencement date to be the date of the consummation of the transaction. *See Rodriguez v. SLM Corp.,* 2009 WL 598252, *4 (D. Conn. Mar. 6, 2009). Here, the plaintiff argues both that the TILA violations occurred and the transaction was consummated on July 13, 2007, when Capela signed the Purchase Agreement. DE[19] at 12. This lawsuit was not commenced until March 2009, more than a year later.

"A federal suit complains of injury from a state-court judgment, even if it appears to complain only of a third party's actions, when the third party's actions are produced by a state-court judgment and not simply ratified, acquiesced in, or left unpunished by it." *Hoblock,* 422 F.3d at 88. Applying this formula, and accepting the plaintiff's arguments that the injuries he complains of occurred prior to the state court judgment and he does not seek rescission of the Purchase Agreement, I find that this lawsuit does not complain of an injury caused by the state court order and seek that order's reversal, inasmuch as the order "simply" approved the Purchase Agreement entered into by the parties. That finding is reached with some concern, inasmuch as the current lawsuit seeks to turn New York State approval proceedings pursuant to New York's SSPA on their heads by redesignating the transfer procedure as a loan, and by ignoring the state court's ruling that no federal or state statutes were violated by the transaction. Nonetheless, the constricted post-*Exxon-Mobil* application of Rooker-Feldman requires that conclusion. *See McKithen,* 481 F.3d at 97-99; *Green,* 438 F. Supp. 2d at 121. That does not, however, mean that this lawsuit should not be dismissed on other grounds, as discussed *infra.*

**Preclusion Principles:**

A.) Issue Preclusion

The defendants also argue that dismissal of the complaint is required on issue and claim preclusion grounds. DE[18-1] at 13-16, DE[20] at 4-5. Post *Exxon Mobil,* the Rooker-Feldman inquiry is distinct from the question of whether issue preclusion (collateral estoppel) or claim preclusion (res judicata) will defeat a federal plaintiff's suit. *Hoblock,* 422 F.3d at 92-93. Under New York law, issue preclusion will apply only if "(1) the issue in question was actually and necessarily decided in a prior proceeding, and (2) the party against whom [issue preclusion] is

asserted had a full and fair opportunity to litigate the issue in the first proceeding." *Id.* at 94.
The issue here is whether defendants failed to make required disclosures under TILA and GBL
§349 in relation to the transfer of Capela's structured settlement rights.  That issue was not
actually decided in the state court action, the state court's finding that no state or federal statutes
were violated by the procedure notwithstanding.  As in the Rooker-Feldman analysis, the
necessity of ignoring the state court's finding is unfortunate, but the state court itself applies
issue preclusion sparingly, and this court thus finds that the doctrine does not apply here.

B.) Claim Preclusion

Claim preclusion rests not on whether a claim was actually decided, but on whether a
final decision on the merits precludes the parties from relitigating issues that "could have or
should have been raised in a prior proceeding arising from the same factual grouping, transaction,
or series of transactions."  Here, the claim - that the transfer between the parties violated TILA
and GBL §349- clearly arose out of the same factual grouping or transaction as the one approved
by the state court.  New York's transactional approach to claim preclusion bars a later claim
arising out of the same factual grouping as an earlier litigated claim even if, as here, the later
claim is based on different legal theories or seeks dissimilar or additional relief.  *Humbles v.
Reuters America, Inc.,* 2006 WL 2547069 at *8 (E.D.N.Y.  Aug. 31, 2006).  Further, the federal
suit must involve the same parties as in the prior state proceeding, or parties in privity to them.
*Green,* 438 F. Supp. 2d at 121 (internal citations omitted).  Thus, for claim preclusion to bar a
subsequent action, the court must determine that: (1) the previous action involved an
adjudication on the merits; (2) the previous action involved the parties or those in privity with
them; and (3) the claims asserted in the subsequent action were or could have been raised in the

previous action.  *Id.* (citing *Monahan v. New York City Dept. of Corrections,* 214 F.3d 275, 284-85 (2d Cir. 2000)).  "Relevant considerations include whether the same transaction or series of transactions is at issue, whether the same evidence is needed to support both claims, and whether the facts essential to the second action were present in the first."  *Id.* (citing *NLRB v. United Techs. Corp.,* 706 F.2d 1254, 1260 (2d Cir. 1983)).

Capela does not dispute that the state court proceeding reached a decision on the merits, but argues that there is no privity because "321 Henderson was the only defendant who was a party to the state court proceeding," and that, at most, the court could dismiss under claim preclusion theory only as to that defendant.  DE[19] at 17-18.  The defendants argue that because this entire lawsuit is based on the process of the transfer of Capela's rights to Henderson, if the other defendants are not in privity with Henderson, Capela has no claims against them.[5]  DE[20] at 6.  Further, Capela's own attorney[6] belies the claim that Capela dealt only with Henderson.  He reports that throughout the process culminating in the transfer, Capela "dealt in telephone calls and written correspondence with 'J.G. Wentworth,' until he signed the contract for the loan, which listed defendant 321 Henderson Receivables Origination, LLC . . . as the sole other party."  Bigelow Aff., ¶2.  It is unclear which Wentworth entity he means, but Capela apparently dealt with some entity in addition to Henderson.  The plaintiff can't have it both ways - either the plaintiff dealt only with Henderson and one of the Wentworth companies, in which case

---

[5]The Complaint suggests that potential class members have claims against the other named defendants, but it offers no explanation as to the relationship Capela may have had with any of the corporate defendants, other than to allege that he and "each class member entered into a consumer credit transaction with one of the Defendants . . ." DE[1], ¶47.  This alone may support a dismissal of the Complaint.  *See infra*, p.19.

[6]The court notes that the Bigelow Affidavit is not notarized, but the court will accept the statements of Mr. Bigelow, an officer of the court, as having been sworn to.

Henderson and that Wentworth company are in privity for claim preclusion purposes and all

claims against the other defendants must be dismissed, or, as the Complaint implies, all of the

defendants are in privity with one another.  In either case, privity exists.

Capela next argues that he could not have raised his claims in state court.  In this regard,

the plaintiff points first to an "Admission of Service" which he states he signed "in connection

with [the] state-court application for approval of the transfer of the structured settlement

payments, thus forcing[7] Capela and the class members to agree that they did not oppose the

application and did not intend to oppose it in court or on any future court date."  DE[19] at 16,

Bigelow Aff., Ex. A.  Thus, he continues, the plaintiffs "could not have asserted their TILA

claims in the state-court proceedings without contradicting their own sworn statements" and

claim preclusion does not apply.  DE[19] at 16.  In other words, Capela couldn't raise the new

claims in the earlier action because he agreed not to raise any claims.  He also agreed that he

"fully support[ed] the request for the transfer" and did not "oppose the application."  Bigelow

Aff., Ex. A.  Thus, his sworn statement, submitted to the state court with advice of counsel,

asserted his support for the transfer and all that led up to it.  Capela's bizarre claim now that the

Admission of Service prevented him from raising the TILA and GBL claims in the state court

proceeding could be interpreted to mean that he knew about those claims at the time and

misrepresented his position to the state court, instead saving those claims for a later use.  This

line of reasoning raises questions about waiver of the claims and about Capela's good faith

_____

[7]Capela claims in his Memorandum of Law in Opposition that he was "forced" to sign the document, but there is no fact alleged in the Complaint from which such a conclusion can be inferred on this motion to dismiss.  Capela was apparently required to sign the form in order to get his money, but that is not the same thing as having been "forced" to sign it, a claim that connotes being made to do something against one's will.

participation in the court proceeding, but I will not consider those issues on this motion, other than to find that the Admission of Service does not establish that the claims could not have been raised earlier.

In any event, Capela denies that he knew about TILA when he entered into the transaction with Henderson. Instead, he specifically argues that he could not have raised the TILA claims at the time of the state court proceeding, because he didn't know about them. Now, he claims, "newly discovered evidence" has arisen, evidence that was "fraudulently concealed," thus barring the application of claim preclusion. DE[19] at 17 (citing *In re Lawrence,* 293 F.3d 615, 621 (2d Cir. 2002)). The defendants, he argues, misled him by calling the transaction a "sale" instead of a "loan," in an attempt to avoid the requirement of providing TILA and GBL §349 disclosures and that he thus did not know until after the state court proceeding that the transaction was subject to TILA. *Id.* The plaintiff does not, however - either in the Complaint or in his opposition to the motion - suggest what that newly discovered "evidence" might be and the Complaint is further devoid of any claim of fraud or the detailed allegations that such a claim would require. In short, it lacks sufficient, non-conclusory allegations that would allow the court to find this claim to be plausible.

What this action actually presents is not new evidence, but a new legal theory advanced by Capela's new lawyers. The court notes that Capela was represented by counsel in the state court proceeding, and no one involved - not Capela, his lawyer, the defendants, their lawyers or the Supreme Court Justice - treated the transaction as one to which TILA or GBL §349 were applicable.[8] Capela's new lawyers argue that TILA and GBL §349 apply to the underlying

---

[8]This may well be because, as I conclude *infra*, they are not applicable.

transaction, and his previous lawyer either didn't agree or just didn't think of it.  Ignorance of the

law on the part of a lawyer (or a represented party) is not a viable excuse, and Capela's

arguments do not support a finding against the application of claim preclusion.

For these reasons, I find that all of the requirements for claim preclusion are met, and that

the Complaint should be dismissed on that ground.  The claims also should be dismissed for

failure to state a claim, and I turn now to that ground for dismissal.

**Failure to State A Claim:**

A.) General Dismissal Standards:

As noted earlier, the standards applicable to a motion to dismiss have been newly

articulated by the Supreme Court in *Twombly* and later cases such as *Ashcroft*.  *Ashcroft* made

clear that not all allegations in a complaint are entitled to the assumption of truth.  Legal

conclusions framed as "facts" are such allegations.  The Complaint here repeatedly alleges that

the defendants made loans, but that allegation is a legal conclusion, not a factual allegation.

Indeed, the entire Complaint is based on that legal conclusion.  In a sense, every complaint is

based on legal conclusions, but those conclusions must be accompanied by sufficient factual

allegations to "nudge" the plaintiff's claims "across the line from conceivable to plausible."

*Ashcroft,* 129 S. Ct. at 1951.  "Threadbare recitals of the elements of a cause of action, supported

by mere conclusory statements, do not suffice."  *Id.* at 1949.  Here, the allegations that state

purported facts - such as those set out in paragraphs 6 (defendants call transactions sales); 8

(defendants disclosed discount rates); 10 (describing general nature of transactions); 11 (further

description of transactions); 15 (disbursements took several months, not weeks) - do not bring

the Complaint into the realm of plausibility.  The Complaint is devoid of any factual detail about

the transaction between Capela and Henderson that might set forth a plausible claim based on TILA or GBL §349, much less against any of the other defendants.  As noted *supra* in the discussion of privity among the defendants, the Complaint suggests that potential class members have claims against the other named defendants, but it offers no explanation as to the relationship Capela may have had with any of the corporate defendants, other than to allege that he and "each class member entered into a consumer credit transaction with one of the Defendants . . ."  DE[1], ¶47.  This lack of detail alone supports a dismissal of the Complaint under the plausibility standard.

In sum, the factual allegations in the Complaint do not allow the court to infer more than the mere possibility of misconduct (if that), and it must be dismissed pursuant to *Twombly* and *Ashcroft*.  The same result flows from a detailed analysis of the specific statutory claims set forth in the Complaint.  As a matter of law, Capela has not stated claims under those statutes.

B.) The TILA Claim

The plaintiff's TILA claim rests on his characterization of the underlying transaction as a loan.  The defendants argue that the plaintiff's TILA claim must be dismissed, because, as a matter of law, the underlying transaction was a sale, and not a loan or credit transaction governed by TILA.  A loan has been defined as "[d]elivery by one party to and receipt by another party of a sum of money upon agreement, express or implied, to repay it with or without interest . . . . Anything furnished for temporary use to a person at his request, on condition that it shall be returned, or its equivalent in kind, with or without compensation for its use."  *Black's Law Dictionary,* 5th Ed. (*quoted in Hamilton v. York*, 987 F. Supp. 953, 956 (E.D. Ky. 1997)).  In its simplest terms, a loan is a transaction in which something, often money, is transferred to

someone who is obligated to pay it back.  By these definitions, the transaction between Capela and Henderson was not a loan.

As the defendants explain, the transaction between Capela and Henderson cannot be considered a loan because Capela has no obligation at all to pay the settlement installments if Allstate fails to do so.  The Purchase Agreement explicitly provides that Henderson "SHALL NOT HAVE THE RIGHT TO SUE YOU IF OR BECAUSE THE ANNUITY COMPANY IS NOT ABLE TO MAKE PAYMENTS BECAUSE IT IS NOT FINANCIALLY ABLE TO DO SO."  DE[23], Ex. B at ¶8 (emphasis in original).  Capela argues that "TILA applies to transactions in which an entity provides short-term funds to a consumer in exchange for the right to subsequent payment of a greater sum."  DE[19] at 18 (citing cases).  The cases relied on by the plaintiff involved the application of TILA to "payday," "deferred deposit" or "check-cashing" transactions.  A payday loan was defined by one court as "short-term, high-interest, single-payment credit for which the lender requires a post-dated check that can be cashed after the borrower's next payday."  *Brown v. Payday Check Advance, Inc.,* 202 F.3d 987, 989 (7th Cir. 2000).  Another court defined the check cashing arrangement at issue as one in which the plaintiffs gave the defendant "a document in the form of a check in exchange for cash."  *Hamilton,* 987 F. Supp. at 955.  The defendant agreed to hold the "check" for two weeks before presenting it for payment or before requiring the plaintiffs to "pick up" the check by paying the face amount.  The charge for cashing and holding the check for two weeks was 20% of the sum advanced.  *Id.*  In the deferral transaction before the court in *Hamilton,* the defendant would allow the plaintiffs to "defer presentment of their check in exchange for an additional 10% of the sum originally advanced for each week of deferral."  *Id.*  The courts allowed the application of

20

TILA to these transactions, and the transactions are, as the plaintiff alleges, transactions in which an entity provides short-term funds to a consumer in exchange for the right to subsequent payment of a greater sum." DE[19] at 18 .  What Capela fails to note, however, is that, unlike his transaction with Henderson, each of the arrangements in the cases he cites required the person who received the funds to pay them back out of their own money, and there was no assignment of their rights with a transfer of repayment obligation to another.

   The defendants term this difference the "existence of recourse" and argue that such recourse against the borrower is "a classic element of a loan transaction."  DE[20] at 7-8 (citing *Transmedia Restaurant Co. v. 33 East 61st St. Restaurant Corp.,* 184 Misc. 2d 706, 710-11 (Sup. Ct. N.Y. Cty. 2000); *People of the State of New York v. The Service Institute, Inc.,* 101 Misc. 2d 549, 551-52 (Sup. Ct. Suffolk Cty. 1979)).  Nothing in the plaintiff's argument based on "payday loans" or their ilk, in which the person who got the loan has to pay it back, changes that conclusion.  Unlike the plaintiffs in the cases he cites, Capela did not incur any debt or potential debt as a result of the transaction and it was not a loan or credit transaction governed by TILA, but a transfer of structured settlement rights governed by New York's SSPA.

   The SSPA is a comprehensive and detailed statutory framework that took effect in 2002. It regulates the transfer of structured settlement rights with its own disclosure and court-review requirements.  Although it refers to "tranfers," not "sales," it clearly does not treat the assignment transactions as loans or consider them as such.  At least one New York case, decided just before the SSPA took effect, has expressly found that an assignment of structured settlement rights "is not a loan but an absolute assignment," although the assignment in that case was invalidated due to a prohibition clause in the settlement agreement barring assignments.  *See Singer Assett*

*Finance Co. v. Bachus,* 294 A.D.2d 818 (4th Dep't 2002).  I have found no post-SSPA cases

finding otherwise, and research has yielded no federal cases directly considering the question of

whether assignment of structured settlement rights should be subject to TILA requirements.  One

case in the Bankruptcy Court in the Eastern District of Virginia, considering what the discount

rate in a debtor's assignment of structured settlement payment rights was, <u>compared</u> the

assignment to a loan and figured the comparable Annual Percentage Rate under TILA.  *In re*

*Granati,* 270 B.R. 575, 584 n. 8 (Bankr. E.D. Va. 2001).  The plain meaning of the comparison

was that the structured settlement assignment was one thing, while a loan is another, and there

was no application of TILA requirements to the assignment at issue.  *See also 321 Henderson*

*Receivables Origination, LLC v. Ramos,* 91 Cal. Rptr. 3d 222, 232 (Ct. App. 2009) (noting that

"if" the transfer of structured settlement rights "was a loan, equivalent interest rate would be

13.57 percent per year").

        The mere absence of previous caselaw applying TILA to structured settlement transfers

does not, in and of itself, mean that TILA does not apply.  One court, considering the application

of TILA to deferred deposit and payday loans,  noted that it is a common task of courts to

determine whether a "particular conduct or transaction falls into a class of conduct or transaction

that a statute regulates." In his view, TILA is particularly suited to such determinations, inasmuch

as it "regulates the extension of credit in various forms and in fact anticipates that the form of

credit will be ever changing."  *Arrington v. Colleen, Inc.,* 2001 WL 34117735, *4 (D. Md. Mar.

29, 2001).  Here, however, the application of TILA to the underlying transaction requires such

stretching of the definitions of loan and credit that I find that TILA simply does not apply.

        In sum, the fact that the plaintiff has alleged the applicability of TILA by calling the

underlying transaction a loan does not make that description a reality.  Perhaps this issue can be summed up by the colorful metaphor employed by District Judge Urbina in *Bradshaw v. Unity Marine Corp., Inc.,* 147 F. Supp. 2d 668, 671 (S.D. Tex. 2001).  "[A]t the end of the day, even if you put a calico dress on it and call it Florence, a pig is still a pig."  You can call the assignment of structured settlement rights a TILA-governed loan as often as you like, but unless Congress says otherwise, a sale is still sale.  The TILA claim should be dismissed for failure to state a claim.

B.) The GBL §349 Claim

New York's GBL §349 prohibits "deceptive acts and practices in the conduct of any business, trade or commerce or in the furnishing of any service in this state . . . ."  To state a claim under the law, a plaintiff must allege acts or practices that (1) are consumer oriented; (2) are misleading in a material way; and (3) have caused injury to the plaintiff.  *Stutman v. Chemical Bank,* 95 N.Y.2d 24 (2000).  Capela alleges in the Complaint that the defendants' consumer-oriented conduct consisted of "engaging in factoring loans to consumers," and that their deceptive acts and practices consisted of failing to inform him "of the true interest rate for loans."  DE[1], ¶¶52 & 53.  He also claims that he was told that he would receive his money within six to eight weeks but had to wait "several months" for it.  *Id.*, ¶¶55 & 56.  Inasmuch as I have found that the transaction between the parties was not a loan, the defendants did not "engag[e] in factoring loans," and they had no duty to disclose interest rates related to loans.  Thus, the standards for stating a claim under section 349 are not met and the claim must be dismissed for failure to state a claim.

To the extent that a separate claim is set forth in Capela's allegation that the length of

time it took for him to receive his money was a misrepresentation, it also fails.  As with all of the

other claims in the Complaint, there is such a dearth of detail about Capela's dealings with

Henderson that there is no basis for finding that this claim is plausible.  Indeed, the Complaint is

devoid of any details about when or where the six-to-eight week statement was allegedly made

and how long it was before Capela actually got his money from Henderson or when he expected

to get it.  The Purchase Agreement states, in all-cap, bold type: "**PLEASE BE ADVISED**

**THAT PAYMENT TO YOU PURSUANT TO THE TRANSFER AGREEMENT IS**

**CONTINGENT UPON COURT APPROVAL OF THE TRANSFER AGREEMENT. . . .**

**PLEASE BE ADVISED THAT PAYMENT TO YOU WILL BE DELAYED UP TO 30**

**DAYS OR MORE IN ORDER FOR THE COURT TO REVIEW AND APPROVE THE**

**TRANSFER AGREEMENT.**"  DE[23], Ex. B at Schedule 1, Page 4 (emphasis in original).

Capela signed the Purchase Agreement on July 13, 2007.  It is unclear from the record when

Henderson started the state court action, but Capela acknowledged in his Admission of Service

that he had received the papers regarding that action on August 18, 2007.  The state court issued

its order on March 7, 2008, a date over which the defendants had no control.  Given these facts,

there is absolutely no basis for finding plausible the claim that the defendants deceived or misled

Capela, and no claim is stated under NY GBL §349.

　　　　I note further that the plaintiff has set forth his claims as a class action and argues, in

opposition to this motion, that his section 349 claims can go forward as a nationwide class

action.  The *Twombly* court has noted that a "district court must retain the power to insist upon

some specificity in pleading before allowing a potentially massive factual controversy to

proceed."  127 S. Ct. at 1967 (internal citations omitted).  Here, there is no specificity in pleading

that would allow the court to sustain the claims alleged and they must be dismissed.

**Abstention Doctrines**

In their Memorandum of Law in Support of the motion, the defendants argue that this court should abstain from hearing Capela's claims based on federalism concerns, citing a Supreme Court case, *Quackenbush v. Allstate Ins. Co.,* 517 U.S. 706 (1996), for the proposition that even though a federal court "may have jurisdiction over a particular proceeding, it may, in its sound discretion, refuse to exercise that discretion, with proper regard for the rightful independence of state governments and their domestic policies." DE[18-1] at 16. Although the defendants do not specify which abstention doctrine might apply here, *Quackenbush* dealt with "the scope of the *Burford* abstention doctrine," and I assume that is the variety of abstention upon which the defendants rely. *See* 517 U.S. at 722.

Generally, the *Burford* doctrine applies: "(1) where there are 'difficult questions of state law bearing on policy problems of substantial import whose importance transcends the result in the case then at bar' or (2) where the 'exercise of federal review of the question in a case and in similar cases would be disruptive of state efforts to establish a coherent policy with respect to a matter of substantial public concern.'" *City of New York v. Milhelm Attea & Bros., Inc.,* 550 F. Supp. 2d 332, 342 (E.D.N.Y. 2008) (citations omitted). The defendants argue that federal review of the claims in this case would disrupt the SSPA scheme created by New York as the "exclusive mechanism" for review of the transfer of structured settlement rights. The plaintiff argues, however, that *Burford* applies only to equitable claims, and that the TILA claim is a matter of federal concern. DE[19] at 5-6. *Quackenbush* notes that under Supreme Court precedents, "federal courts have the power to dismiss or remand cases based on abstention principles only

25

where the relief being sought is equitable or otherwise discretionary." 517 U.S. at 731. Here, the plaintiff seeks only damages under TILA, and damages and injunctive relief under GBL §349. The defendants do not respond to the plaintiff's argument in their reply brief.

Although there are arguments to be made that *Burford* might apply here, where New York's comprehensive SSPA scheme is implicated, I decline to make a determination on the issue. The defendants appear to have abandoned the ground, and sufficient alternative grounds for dismissal exist that the *Burford* ground need not be considered.

## CONCLUSION

For the reasons set forth herein, I respectfully recommend that the complaint be dismissed in its entirety because: (1) the claims are barred by the application of claim preclusion and (2) the plaintiff has failed to state a claim either under TILA or NY GBL §349.

## OBJECTIONS

A copy of this Report and Recommendation is being sent to counsel for the parties by electronic filing on the date below. Any objections to this Report and Recommendation must be filed with the Clerk of the Court within 10 days. *See* 28 U.S.C. §636 (b)(1); Fed. R. Civ. P. 72; Fed. R. Civ. P. 6(a) and 6(d). Failure to file objections within this period waives the right to appeal the District Court's Order. *See Ferrer v. Woliver,* 2008 WL 4951035, at *2 (2d Cir. Nov. 20, 2008); *Beverly v. Walker,* 118 F.3d 900, 902 (2d Cir. 1997); *Savoie v. Merchants Bank,* 84 F.3d 52, 60 (2d Cir. 1996).

Dated: Central Islip, New York
      September 24, 2009

                          /s/ William D. Wall
                          WILLIAM D. WALL
                          United States Magistrate Judge